# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 2017-0001 |
| PATRICIA HENRY and PHIONA A. HENRY, | ) |
| | ) |
| Defendants. | ) |

**Attorneys:**
**Meredith J. Edwards, Esq.,**
St. Thomas, U.S.V.I.
 *For the United States*

**Gabriel J. Villegas, Esq.,**
St. Thomas, U.S.V.I.
 *For Defendant Patricia Henry*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Patricia Henry's ("Defendant" or "Henry") "Amended Motion to Suppress Statements" (Dkt. No. 66) ("Amended Motion to Suppress"); the Government's "Response to Defendant's Motion to Suppress Statements" (Dkt. No. 77); the testimony at the suppression hearing; Defendant's supplemental memorandum and the exhibits attached thereto (Dkt. No. 107); and the Government's supplemental response (Dkt. No. 109). For the following reasons, the Court will deny Defendant's Amended Motion to Suppress.

### I. BACKGROUND

On January 12, 2017, the Government filed an Indictment against Defendants Patricia Henry and Phiona Henry. (Dkt. No. 1). The eleven-count Indictment charged Defendant with one

count of Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 286.[1] *Id*. at 2.

According to the Indictment, from 2010 through 2013, Defendants participated in a scheme to steal money from the United States Treasury by fraudulently obtaining federal income tax refunds. *Id*. at 3. Defendants allegedly acquired personal information (i.e., name, social security numbers, and dates of birth) from numerous individuals—some without their knowledge or consent—and, using this information, caused income tax returns from 2009-2012 to be electronically filed with the Internal Revenue Service ("IRS") on these individuals' behalf. *Id*. Defendants allegedly falsified information on these tax returns in order to claim refunds to which they were not entitled. *Id*. Defendants then designated bank accounts that they had procured to receive these refunds, withdrew the amounts, and spent the money by either using a debit card or transferring the amounts to another account for their personal use. *Id*. at 5. As a result of the scheme, Defendants allegedly received over $100,000 in illegal tax refunds. *Id*. This includes 11 tax returns for which refunds totaling $71,517.00 were deposited into an account owned by Phiona Henry and subsequently withdrawn.[2] *Id*. at 3-4.

At the suppression hearing, Stephen Wagner ("Wagner"), a former Special Agent with IRS Criminal Investigation, testified. The following facts emerged from the record established at the

---

[1] In Defendant's Amended Motion to Suppress, she claims she was also charged with Aggravated Identity Theft in violation of 18 U.S.C. § 1028A in Count 12. (Dkt. No. 66 at 1). However, a review of the Indictment reveals that a Count 12 does not exist. Instead, Defendant's daughter, Phiona Henry, was charged in the Conspiracy count as well as in the other ten counts (i.e., Counts 2-5 "Theft of Government Money," in violation of 18 U.S.C. § 641; and Counts 6-11, "Aggravated Identity Theft," in violation of 18 U.S.C. § 1028A(a)(1)). (Dkt. No. 1 at 6-8).

[2] Another $54,239 in tax refunds from false tax returns were allegedly claimed by Defendants but were not paid out. (Dkt. No. 1 at 4).

suppression hearing.[3]

Wagner's investigation into Henry began in 2013, when he received a tip from Andrea Ferdinand. The latter had contacted the Virgin Islands Bureau of Internal Revenue alleging that Henry had stolen her identity and had fraudulently filed a tax return with the federal government on her behalf. Wagner and other agents conducted several meetings with Ms. Ferdinand during the investigation and interviewed other individuals who also allegedly had tax returns fraudulently filed in their names by Defendants.

Sometime in early July 2015,[4] Wagner telephoned Henry. During the call, Wagner identified himself as a Special Agent with IRS Criminal Investigation, informed Henry that he was working on an investigation involving tax returns, and advised that he needed to speak with her in person if she were willing. Wagner testified that the two of them "mutually" agreed to meet in person in the parking lot of an elementary school near Henry's house—a location which Wagner initially said he suggested.[5]

---

[3] The Court bases the background factual discussion in this section on the record established at the suppression hearing. Unless otherwise specifically indicated, the facts recounted herein come from the testimony of former Special Agent Wagner. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Patricia Henry is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[4] Wagner could not recall the exact date of the telephone call. He also was not able to recall whether the meeting with Henry occurred the same day as his telephone call or whether it occurred a few days later.

[5] Wagner testified that while he did not offer to meet with Henry at her house, he did not deny it as an option either. Wagner stated that he preferred not to meet at Henry's house because Henry lived in a dangerous neighborhood for law enforcement, and he cited recent instances of shootings involving police officers.

3

On July 6, 2015, Henry and Wagner met in person at the school's parking lot.[6] Wagner confirmed that, by this point, Henry was a "subject of an investigation" for her alleged involvement in filing false tax returns. Wagner was accompanied by Special Agent Janine Claxton ("SA Claxton") from the Virgin Islands Bureau of Investigation. Both officers were dressed in plain clothes and their firearms were concealed throughout the interview.

Upon meeting Henry, Wagner showed her his badge and credentials; told her who he was; introduced SA Claxton; and informed Henry that she was not under arrest and that she was free to leave whenever she wanted. Wagner also told Henry that he and SA Claxton were just there to ask her questions. At the hearing, Wagner stated that, if Henry had chosen to end the interview, he would have allowed her to leave and they would have "gone their separate ways."

Wagner then proceeded to interview Henry about several tax returns that were filed in her name, showing her documents and combing over the personal information listed on the forms. The tone of the interview was described by Wagner as conversational and the atmosphere as "fairly casual." In fact, according to Wagner, at one point during the meeting, a young female—who Wagner posited may have been one of Henry's daughters or granddaughters—came to speak and stand with her.

Wagner estimated that the meeting may have lasted about an hour and 45 minutes. He confirmed that the entirety of the interview took place in front of his vehicle in the parking lot, and that he and SA Claxton stood "about a foot away" from Henry—close enough to show her documents. When questioned about the weather on the day of the meeting, Wagner said he did not remember. However, Wagner testified that Henry never asked to take a break or "acted like she

---

[6] Wagner testified that the parking lot was close enough to Henry's home that she walked over to meet him.

needed or wanted to" take one, nor did Henry ever ask Wagner to conduct the interview inside his vehicle which had air conditioning, nor did he offer to do so.[7]

According to Wagner, during the interview, Henry did not appear to have a mental or physical disability or appear to be under the influence of drugs or alcohol. When asked by defense counsel whether he knew what Henry did for a living and whether it was "menial" work, Wagner stated only that he knew Henry sold snacks and cooked, but he had no knowledge about her educational background. Wagner further stated that Henry displayed no difficulty addressing the questions he asked during the interview and provided appropriate answers to his inquiries. Finally, Wagner testified that at no point during the interview were threats made against Henry, nor was her ability to leave blocked by the agents in any way. Wagner further testified that he and SA Claxton were by no means "pinning" Henry between themselves or the vehicle, or in any way "preclud[ing] her from leaving" the interview. It is undisputed that Wagner did not read Henry her *Miranda* rights prior to the interview.

Henry's motion seeks to suppress the statements she made during the July 6, 2015 interview with Wagner and SA Claxton. Henry argues that the statements she made to law enforcement must be suppressed because they were taken while "she was placed in custody and questioned without being read her *Miranda* rights." (Dkt. No. 66 at 2; Dkt. No. 107 at 9-10). Thus, according to Defendant, her "statements were obtained in violation of her privilege against self-incrimination, her right to counsel as guaranteed by the Fifth and Sixth Amendments, and the Supreme Court's holding in [*Miranda*]." (Dkt. No. 66 at 2). Defendant further argues that "any

---

[7] When asked by defense counsel whether Wagner offered Henry any water, Wagner stated he did not do so because he did not have any water to offer, and that Henry, on her part, never asked for a break.

statements, admissions, or confessions were also involuntary and made in violation of the Due Process Clause of the Fifth Amendment." *Id*. at 3.

In opposition, the Government contends that "there is simply no basis from the record to conclude that the circumstances were such that [] Henry was the subject of custodial interrogation" implicating *Miranda*, and that Henry's "incriminating statements" were made voluntarily. (Dkt. No. 109 at 10). [8]

## II. <ins>APPLICABLE LEGAL PRINCIPLES</ins>

The Fifth Amendment's Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). *Miranda*'s holding is based on a recognition that "interrogation in certain custodial circumstances

---

[8] In her Amended Motion to Suppress, Defendant also sought the suppression of certain bank and tax records, contending that "[t]he illegally obtained statements were used to secure additional evidence, including [her] bank and tax records," and thus this evidence must be suppressed as "'fruit of the poisonous tree' of the Fifth Amendment violation." (Dkt. No. 66 at 3). However, during the hearing, it was revealed that, in the course of his investigation—and separate and apart from his meeting with Henry—Wagner had requested grand jury subpoenas for Henry's bank and tax records prior to interviewing Defendant. (Dkt. No. 105 at 24-25). The Court therefore finds that the premise of Henry's argument has been negated, thereby rendering the argument meritless.

is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984). *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). "[T]he presence of both a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 395 (D.V.I. 1997); *see also Alston*, 34 F.3d at 1244 (same); *United States v. Mattox*, 2018 WL 3622777, at *3 (M.D. Pa. July 30, 2018) (same); *United State v. Mejia*, 2016 WL 7191630, at *19 (D.V.I. Dec. 10, 2016) (same); *Booker v. United States*, 2010 WL 2985982, at *12 (D.N.J. July 26, 2010) (same).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citation and quotation marks omitted). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). In order to conclude that a person who has not been arrested is in custody, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to

allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler,* 496 F.2d at 799 (internal quotations omitted)). "[T]he relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth,* 118 F. Appx. 649, 650 (3d Cir. 2004) (citing *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

It has been recognized by the Supreme Court that, under certain circumstances, "noncustodial interrogations may . . . be characterized as [involuntary].'" *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (quoting *Beckwith v. United States,* 425 U.S. 341, 347-48 (1976)). Thus, where a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, the government retains the burden of proving, "by a preponderance of the evidence, that a challenged statement was voluntary." *Jacobs*, 431 F.3d at 108.

"A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker." *Id*. (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973)). Accordingly, a confession will not be found involuntary unless "it was the product of police overreaching." *Swint*, 15 F.3d at 289 (internal citation and

quotation marks omitted); *see also Jacobs*, 431 F.3d at 108 ("A necessary predicate to a finding of involuntariness is coercive police activity.") (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Further, there must also be a "causal connection between the police conduct and the confession." *Id*. Statements made to law enforcement that are involuntary are inadmissible as evidence. *Jacobs*, 431 F.3d at 108 (citing *Schneckloth*, 412 U.S. at 225-26).

### III. DISCUSSION

#### A. Custodial Interrogation

The question here is whether Henry was subject to a custodial interrogation during the July 6, 2015 meeting, thereby necessitating the issuance of *Miranda* warnings. Based on the totality of the circumstances, the Court finds that Henry was not "in custody" under *Miranda*, and therefore the absence of *Miranda* warnings did not result in a violation of Henry's constitutional rights.

In order to invoke *Miranda's* exclusionary rule, the statement must have been obtained during a custodial interrogation. *Innis,* 446 U.S. at 299-300; *United States v. Mesa,* 638 F.2d 582, 584 (3d Cir.1980) ("*Miranda* warnings are designed to protect against the evils of 'custodial interrogation,' and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions."). While the Court agrees that an interrogation occurred here, the Court concludes that Henry was not in custody during her interview with law enforcement.

The critical issue in assessing custody is whether, "in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal citations and quotation marks omitted). The Third Circuit has identified several factors that courts should weigh in determining

9

whether an individual is "in custody" during questioning for purposes of the *Miranda* analysis. These include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60. Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," *Jacobs*, 431 F.3d at 105 (citing *Steigler*, 496 F.2d at 799), and "whether the officer[s] revealed [their] belief that the suspect was guilty." *Id.* (citing *Stansbury*, 511 U.S. at 325).

With regard to the first *Willaman* factor, Henry herself concedes that Wagner unequivocally told her that she was not under arrest and that she was free to leave whenever she wanted. (Dkt. No. 107 at 5-6). In addition to testifying that he told Henry that she was not under arrest and that she was free to leave, Wagner confirmed that if Henry had chosen to end the interview, they would have just "gone their separate ways." Thus, this factor weighs against a finding of custody. *Willaman*, 437 F.3d at 360 (finding defendant was not in custody when the latter was told twice by law enforcement that he was free to leave); *see also United States v. McFall*, 2012 WL 194078, at *5 (W.D. Pa. Jan. 19, 2012) (finding, *inter alia*, that the fact defendant was told he was free to leave if he did not want to answer any questions and that he was not under arrest weighed in favor of finding that the interrogation was noncustodial).

Henry claims, however, that since Wagner considered Henry as the "subject" of his two-year criminal investigation by the time they met in person at the parking lot and "believed [that] she was guilty of a crime," this inevitably "creat[ed] the kind of atmosphere of significant restraint that triggers *Miranda* and vice versa." (Dkt. No. 107 at 5) (internal citation and quotation marks

omitted). Further, because "Wagner had yet to meaningfully connect [] Henry to any alleged fraudulent returns beyond the mere accusation of others, the risk that he would 'bear down' in search of a confession [from her] was high." *Id*.

The Court dismisses Henry's argument here because any suspicion or belief on Wagner's part is not determinative of a finding of a custodial interrogation under *Miranda*. The Supreme Court has emphasized that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. The only instance when an officer's subjective belief is of any significance to a custody determination is when the officer "convey[s], by word or deed, to the individual being questioned" his or her suspicions about the latter's culpability, and by doing so, "affected how a reasonable person in that position would perceive his or her freedom to leave." *Id*. at 325. This did not occur here.

The Court similarly finds no merit in Henry's argument that by showing her the tax returns Wagner impermissibly conveyed his belief that Henry was guilty, thus "securing her admission that she had allegedly included false information in the filings." (Dkt. No. 107 at 5). There is no evidence in the record that Wagner, at any point, accused Henry of any crime. Further, because Henry was informed from Wagner's initial call to her that he was working on an investigation involving tax returns, the showing of the tax returns to her did not impermissibly convey anything. Moreover, the showing of the tax returns to Henry does not negate the fact that Henry could have stopped the interview and left.[9] Thus, under the totality of the circumstances, the Court does not

---

[9] While Henry concedes that she was told she was free to leave the meeting with Wagner, she argues that this information was provided to her only *after* she had left the safe confines of her home and commenced the interview in the parking lot. (Dkt. No. 107 at 6). Henry also contends that the fact that Wagner "never reminded [][ Henry she was free to leave during the lengthy interview," is relevant in determining custody. *Id*. The Court finds these arguments unavailing.

11

find that Wagner's conduct would have led a reasonable person to believe that she was not free to terminate the interview, particularly when she was told that she could do so at any time.

The second factor, which concerns the location or physical surroundings of the interrogation, also weighs against a finding of custody. In *Willaman*, the Third Circuit found that "[w]hen a person is questioned *on his own turf* . . . the surroundings are not indicative of the type of inherently coercive settings that normally accompanies custodial interrogation." 437 F.3d at 360. Henry argues that because the interview was not in her home, i.e., her turf, this should weigh in favor of a finding of custody. (Dkt. No. 107 at 7).

There is of course no requirement that an interview be conducted at a subject's home or at a location chosen by the subject in order for it to be noncustodial. Although the meeting between Henry and the agents did not occur at her home, the record shows that it was at a location that both Henry and Wagner agreed upon[10] and the parking lot was, as pointed out by the Government, "in an area familiar to [Henry]." (Dkt. No. 109 at 7). Indeed, the record shows that the parking lot was close enough to Henry's house that she walked over to meet Wagner. Moreover, throughout her interaction with the agents, Henry was surrounded by an open public lot—unrestrained, unencumbered, and free to leave and return to her home if she so desired. Accordingly, this second factor weighs against a finding of custody.

With regard to the third factor, the length of Henry's interrogation does not evince a

---

The record shows that Wagner told Henry the meeting was voluntary during the telephone call prior to the meeting. Then, Wagner told Henry in person at the meeting that she was free to leave the interview. Nothing more is required.

[10] The Court finds inconsequential Defendant's argument that, despite Wagner's testimony that both he and Henry "mutually agreed" upon the location, it was Wagner who ultimately exercised his choice and had Henry meet him there. (Dkt. No. 107 at 6-8). Regardless of who came up with the location, it does not negate the fact that Henry ultimately agreed to meet Wagner at the location.

custodial situation. The record shows that the interview was a little under two hours. Since "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial," *Killingsworth*, 118 F. App'x at 651-52 (listing cases), the length of the interview here does not weigh in favor of a finding of custody.

Henry urges the Court to take judicial notice of the temperature that day,[11] arguing that an almost two-hour meeting under a hot sun caused Henry's interview to "occur[] under uncomfortable conditions," and the fact that neither agent offered Henry any water rendered her encounter with the agents custodial in nature. (Dkt. No. 107 at 8). The Court does not find any merit to these arguments. An allegedly "uncomfortable" condition for Henry—assuming that it was, in fact, uncomfortable—does not necessarily translate into one that "is inherently coercive," *Quarles*, 467 U.S. at 649, and reminiscent of "the type of station house questioning at issue in *Miranda*." *Arena*, 629 F. App'x at 457. Even if the Court were to take judicial notice of the temperature, this would not alter the Court's conclusion that the third factor weighs against a finding of custody. Among other things, there was no evidence that Henry in any way exhibited any physical discomfort during the meeting. Henry never asked for a break or indicated in any way that she wanted one, nor did she indicate that she was hot, thirsty, or unable to continue with the interview. There was also no evidence that Henry ever asked Wagner to move the interview to another location to escape the heat. As discussed above, "the custody determination is 'an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation.'" *Jacobs,* 431 F.3d at 105. Considering all the circumstances here—including the

---

[11] In her supplemental briefing, Henry attached as Exhibit B "Documentation from the National Oceanic and Atmospheric Administration," showing that the temperature in St. Croix on July 6, 2015 hovered between a minimum of 78 degrees and a maximum of 91 degrees.

freedom that Henry was afforded to leave if she chose—the Court concludes that the summer heat does not tip the balance in favor of a finding of custody for the length of the interrogation factor.

Turning to the fourth factor, the record does not support a finding that the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraints during their encounter with Henry. Wagner testified that he and SA Claxton did not brandish their weapons. Wagner also testified that his tone was conversational as he interviewed Henry and that the meeting's atmosphere was "fairly casual," indicating that, at one point, Henry's young relative came over and spoke with her. Further, Wagner stated that neither he nor SA Claxton made Henry feel like she was "pinned" in to where she was standing. He reported standing about a foot away from her when he was showing her documents. *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009) (finding defendant was not in custody where defendant, among other things, was not verbally or physically restrained by officers, the parties were in a residential hallway, the officers did not raise their voices, display their weapons or block defendant's movements). Thus, there was no evidence that Henry was physically restrained in any way. In sum, this factor weighs against a finding of custody.

With regard to the final *Willaman* factor, the Court finds that Henry's encounter with the agents was consensual. Wagner testified that when he first called Henry, he informed her that he was a Special Agent with the IRS Criminal Investigation working on an investigation involving tax returns, and that he needed to talk to her in person if she was willing. Henry agreed, and she and Wagner met at the elementary school's parking lot. At the interview, Henry was told that she was not under arrest and that she was free to leave. She nonetheless chose to stay and answer Wagner's questions, and then left freely at the end of the interview. These factors indicate a consensual encounter.

Henry argues, however, that the interview constituted a custodial interrogation because she "was questioned in detail about alleged criminal behavior,[] . . . by an agent with special training in interviewing and interrogation techniques," while she "was shown incriminating documents" and while at least one officer questioning her wore a weapon during the interview. (Dkt. No. 107 at 8-9). Even assuming all of these facts are true, under the circumstances here, they are of no import for purposes of the custody determination. In addition to the facts already noted above in connection with this final *Willaman* factor, the record shows that there was no drawing or brandishing of weapons. Nothing in the record indicates that the encounter "involved the type of physical intimidation or psychological coercion which would render [Defendant's] statements involuntary." *Killingsworth*, 118 F. App'x at 652 (citing *Arizona v. Fulminante,* 499 U.S. 279 (1999) and *Schneckloth*, 412 U.S. at 225. Further, there is nothing in the record which indicates that Henry ever told the officers that she did not want to cooperate with them; nor is there any evidence that Henry ever asked or tried to terminate the meeting or that the agents would have rebuffed such a request. *See United States v. May*, 87 F. Appx. 223, 227 (3d Cir. 2003) (finding a defendant was not "in custody" and thus was not subject to custodial interrogation where "[t]he police never indicated they would not heed a request to leave; on the contrary, [the defendant] was told that he was not under arrest and that he could terminate the interview at any time. Moreover, [the defendant]'s freedom of movement . . . was not restricted."); *Leese,* 176 F.3d at 743 (holding that to find custody "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.") (quoting *Steigler,* 496 F.2d at 799). Upon consideration of the circumstances, the Court finds that Henry's arguments do not alter the Court's conclusion that the fifth *Willaman* factor weighs against a finding that Henry was in custody.

Because the Court finds that Henry was not in custody during her July 6, 2015 interview with law enforcement, her *Miranda* rights were not implicated and thus no Fifth or Sixth Amendment violation occurred here.

### B. Voluntariness of Statements

The second issue the Court must consider is whether the statements Henry made to law enforcement were voluntary.

With regard to the voluntariness of a statement, the Third Circuit looks to the "totality of circumstances," to ensure that the statement is "the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will and that the appellant's will was not overborne." *Swint*, 15 F.3d at 289 (internal citation and quotation marks omitted). These circumstances include taking into consideration:

> the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; [the defendant's] education; [the defendant's] physical condition; and [the defendant's] mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.

*Swint*, 15 F.3d at 289 (internal citations omitted); *see also United States v. Rose*, 189 F. Supp. 3d 528, 538 (D.V.I. 2016). Moreover "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *Jacobs*, 431 F.3d at 108. "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary," and thus not admissible into evidence. *Id.*

The Court will address this issue briefly as many of the factors determining voluntariness of statements are similar to those analyzed under the rubric of a custodial interrogation already discussed above. Based on the totality of the circumstances, the Court concludes that the

Government has shown by a preponderance of the evidence that Henry's statements during the interview were voluntary.

As presented, the evidence revealed that the meeting took place in a mutually agreed public location with which Henry was familiar; the interview was conducted in a conversational manner and the atmosphere was "fairly casual;" the agents were dressed in plain clothes and their weapons were not drawn or brandished during the interview; Henry was not verbally abused or physically restrained; Henry was told that she was not under arrest and that she could leave whenever she wanted; the interview was not overly long; and there was no evidence of coercion on the part of the agents. *Stone v. Author*, 2017 WL 5599088, at *26 (D.N.J. Nov. 21, 2017), *appeal dismissed sub nom. Stone v. Attorney Gen. New Jersey*, 2018 WL 3825303 (3d Cir. May 1, 2018) (finding that defendant's statements were voluntary where there was no finding he was subject to a custodial interrogation and defendant "was not physically or psychologically pressured."); *United States v. Lenegan*, 2008 WL 4058715, at *6 (E.D. Pa. Aug. 22, 2008), *aff'd,* 425 F. App'x 151 (3d Cir. 2011) (finding defendant's statements were made voluntarily where there was nothing in the record to indicate "police coercion . . . and [t]he federal agents present were dressed in street clothes and did not display their weapons during the session."). Further, there is no evidence suggesting that Henry's profession, educational background, or intelligence rendered her statements involuntary. In addition, Wagner testified that when he interviewed Henry, she did not appear to have a mental or physical disability or be under the influence of drugs or alcohol. Wagner also stated that Henry had no difficulty answering his questions and provided him with appropriate responses. There is also nothing in the record which suggests that Henry's age, maturity, mental health or physical health at the time of the interview rendered her incapable of making voluntary

statements to law enforcement. *Mattox*, 2018 WL 3622777 at *6. Accordingly, based on the totality of the circumstances, the Court finds that Henry's statements were voluntary.

### IV. CONCLUSION

In view of the foregoing, the Court concludes that Henry was not in custody for purposes of *Miranda* and that her noncustodial statements were made voluntarily. The Court will therefore deny Henry's Amended Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 31, 2018  _____/s/_____
WILMA A. LEWIS
Chief Judge